UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ONLINE PUBLICATION ONLY

-----------------------------------------------------------------x

UNITED STATES OF AMERICA,

       -against-

MEMORANDUM AND ORDER
09-CR-570 (JG)

LARON IRVING,

                 *Defendant.*

-----------------------------------------------------------------x

A P P E A R A N C E S :

    BENTON J. CAMPBELL
        United States Attorney
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, New York 11201
    By:   Amanda Hector
        Jason Jones
        *Attorney for the Government*

    FEDERAL DEFENDERS OF NEW YORK, INC.
        16 Court Street, 3rd Floor
        Brooklyn, NY 11201
    By:   Heidi Cesare
        *Attorneys for Defendant*

JOHN GLEESON, United States District Judge:

      The defendant Laron Irving moves to suppress a gun seized from him when he was arrested on July 9, 2009. He also seeks to suppress statements he made the next morning while in custody. For the reasons stated below, the motion is granted.

### FACTS

      Based on an evidentiary hearing held on November 9, 2009, I find the following facts.

      On the evening of July 9, 2009, Police Officers Robert Frank and Emrah Ates, together with Sergeant Diana Pichardo, all of the New York Police Department, were conducting a routine patrol of New York City Housing Authority buildings in South Brooklyn in an

unmarked car. Tr. 6.[1] At about 10 p.m., the officers received a call from Pichardo's supervisor relaying a noise complaint about some unruly youths at the Nautilus Playground, a park situated between the Coney Island Houses and the Coney Island boardwalk. Tr. 7, 101.

The officers responded to the call. When they arrived, they turned their vehicle onto a walkway running along the length of the park, outside of the park but very close to the park fence.[2] Tr. 31, 39. The only youths the officers observed were a group of children who appeared to be about nine or ten years old. Tr. 7. As the officers continued driving slowly along the walkway, they noticed a man and woman in another part of the playground. Tr. 7, 39. The couple aroused the officers' suspicions because they were in the park after dark without children. Tr. 8, 136, 170-71. Nevertheless, the officers did not immediately stop. Tr. 38. Instead, they circled around the entire housing project, then returned to the park, parked their car, and walked to the area where they had seen the man and woman. Tr. 38. They found the pair seated at a child-sized picnic table beneath a jungle gym built to resemble a ship. What followed is disputed, but within less than a minute of their arrival, the officers, who were in plainclothes, identified themselves as police and arrested both the man, Laron Irving, and the woman, Angelica Mann. Tr. 5, 46, 125-26, 156, 167. The officers searched both of them at the scene. Tr. 172-73. They found nothing on Mann, but Officer Ates discovered a loaded .38 caliber revolver in Irving's waistband. Tr. 127-28.

The officers took Irving and Mann to the stationhouse, where Mann was searched again and Irving was searched two more times. Tr. 29-30. Nothing of note was seized from them at that time. Tr. 51-53. While there, Frank filled out forms documenting the arrest, in which he stated that a gun and six small bags of marijuana had been found on Irving when he

---

[1] "Tr." refers to the transcript of the November 9, 2009 evidentiary hearing.
[2] Only the police, emergency vehicles, and authorized housing authority personnel are permitted to drive on the walkway. Tr. 39.

2

was arrested in the park and another bag of marijuana was found on the ground, where Irving had dropped it. Tr. 79-80. Irving was held in custody overnight. Tr. 68. The following morning, he made a statement admitting possession of the gun to Officer Frank and another police officer who was not present at his arrest. Tr. 20-23.

## DISCUSSION

A. *The Legal Standard*

The officers arrested Irving without a warrant. A warrantless arrest violates the Fourth Amendment unless it is supported by probable cause. "Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990) (citing *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)). "While probable cause 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity,' mere suspicion is not enough." *United States v. Valentine*, 539 F.3d 88, 93 (2d Cir. 2008).

It is the prosecution's burden to establish probable cause to arrest by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 178 n. 14 (1974). Deciding whether that burden has been met is not a mechanical, quantitative exercise; rather, the result turns on whether the trier of fact has been persuaded, even if only by the tiniest margin, that the requisite facts have been established. *See In re Winship*, 297 U.S. 358, 367-68 (1970) ("[T]he preponderance test is susceptible to the misinterpretation that it calls on the trier of fact merely to perform an abstract weighing of the evidence in order to determine which side has produced the greater quantum, without regard to its effect in convincing his mind of the truth of

the proposition asserted."); *see also* Christopher B. Mueller & Laird C. Kirkpatrick, 1 *Federal Evidence* § 3:5 (4th ed. 2009) ("What counts, of course is not volume of evidence, but quality — not how many witnesses or how long they testify, but how persuasive their testimony.").

Here, the government first contended that there was probable cause to arrest Irving for possessing marijuana. When the evidence in support of that claim unraveled at the hearing, the government advanced for the first time an alternative claim – that there was probable cause to arrest Irving for unlawfully being in a park after hours.

B.  *Analysis*

    1.  *The Marijuana Charge*

At the hearing, the government called Officer Robert Frank. According to Frank, all three officers entered the park together and walked as a group to the area where they had previously seen the man and woman. Tr. 40. When Frank was roughly ten feet away from the jungle gym built to resemble a ship, he heard people talking. Tr. 40-41. He turned on his flashlight and pointed it in the direction of the noise. Tr. 41. He saw Irving and Mann sitting at a child-sized wooden picnic table underneath the jungle gym. Tr. 41. Irving was seated on the bench of the picnic table closest to him, holding marijuana in his hands. Tr. 41-42. It appeared to Frank that Irving was using the fingers of one hand to crush marijuana buds for use in a marijuana cigarette, and his other hand was cupped below to catch the marijuana. Tr. 43. Mann was seated on the other side of the picnic table, and on the table itself was a brown cigar rolling wrapper, roughly six inches long and two or three inches wide. Tr. 14, 44. As soon as Frank saw Irving and Mann, he identified himself as a police officer and told them to stand up. Tr. 16, 46. When Irving stood up, he dropped something to the ground. Tr. 16. Frank then asked to see his hands. Tr. 46. During this time, Frank was approaching Irving and Mann. Tr. 16. By the

time Irving dropped the object to the ground, Frank was two to three feet from him, close enough to identify the object as a tiny plastic bag of marijuana, approximately the size of a quarter. Tr. 16, 47. Frank then instructed Ates to handcuff Irving while he picked up the bag of marijuana, put it in his pocket, and searched the ground for anything else Irving or Mann may have dropped. Tr. 16, 47, 50. He didn't find anything else. Tr. 50. Approximately five to ten seconds elapsed between the time Frank first saw Irving and Mann at the table and the time he instructed Ates to handcuff Irving. Tr. 167.

Frank then pointed his flashlight at Irving while Ates frisked him. Tr. 17. During the pat-down, Ates felt a hard object, paused, and lifted Irving's shirt, revealing a gun in his waistband. Tr. 17-18. Frank removed the gun from the Irving's waistband, unloaded it, and put the gun and rounds in his pocket. Tr. 18-19. At the scene, Frank also put six more bags of marijuana, the same size as the one Irving dropped, in his pockets. Tr. 19. Frank testified that those bags were seized from Irving by someone else, but he did not remember who. Tr. 19, 55, 80. After the officers searched Irving and Mann, they took them back to the stationhouse, where they were searched again. Tr. 29-30. Neither lighters nor matches were found on Irving or Mann. Tr. 50-53.

When Frank finished testifying, the government rested. If the defendant had also rested at that time, Frank's uncontradicted testimony would have supported a finding that Irving was not "seized" for Fourth Amendment purposes until after there was probable cause to arrest him for possessing marijuana. But then the defense called Officer Ates, whose testimony differed from Frank's in almost every material respect.

Frank had testified that the officers had entered the park together. Tr. 37. Ates testified that once they exited the car they had split up; he and Pichardo entered the park through

5

one entrance and Frank entered through another. Tr. 118. Frank testified that all three officers had approached Irving and Mann from the same direction, and that they were visible at the child-sized picnic table beneath the jungle gym as the officers approached. *E.g.,* Tr. 9-10. Ates testified that only he and Pichardo approached the couple from that direction, whereas Frank, coming from the opposite direction, had to circle around the enclosure to meet up with Ates and Pichardo. Tr. 117-18, 132.

Frank testified that Irving was preparing marijuana to be rolled into a "blunt wrap," or marijuana cigar. Tr. 15, 42-43. Specifically, according to Frank, he was manipulating the marijuana with one hand to break the buds into smaller pieces, and his other hand was cupped to catch the pieces. *Id.* But even though Ates was standing next to Frank and observing the same two people at the same time, he said neither one of them was holding anything Irving had nothing in his hands, and both he and Mann were doing nothing. Tr. 122-23. Frank said that when he told Irving to stand up, he saw Irving drop some marijuana on the ground. Tr. 16, 46. But Ates was there too, and he saw no such thing, and indeed he saw no marijuana on the scene at all until Frank showed it to him after Irving was already in custody. Tr. 126-29, 158. Frank said there was a cigar wrapper on the table, but it was not seized because cigar wrappers are not contraband. Tr. 50, 90-91. Ates said he saw a cigar wrapper on the ground away from the table, but it was not seized because there was nothing to connect the cigar wrapper to Irving or Mann. Tr. 124. Frank said Irving made "furtive" movements as the officers approached, Tr. 45; Ates flatly denied that anything furtive occurred. Tr. 124.

Frank said six additional bags of marijuana were seized from Irving's pocket on the scene by someone else, although he could not say who the someone else was. Tr. 19, 55, 80. Since he had turned Irving over to Ates to search, Tr. 17, the obvious inference to be drawn from

the case-in-chief was that Ates seized those six packages. But Ates, who in fact searched Irving, including his pockets, recovered only the firearm; he did not seize any drugs from him, Mann, or the scene itself. Tr. 129.

Even accounting for the inevitable minor inconsistencies that crop up when multiple versions of the same events are recounted, Ates's testimony was irreconcilable with Frank's. Recognizing this, the government gamely, if disingenuously, attempted to establish the possibility that Ates was not there when Frank made his observations. Tr. 137 ("The Prosecutor: Sitting here today you can't tell us whether Officer Frank got there a couple of seconds before you or a couple of seconds after you; is that right?") It obviously would not help the government if Ates arrived at the scene *before* Frank, and I reject the suggestion that Ates arrived after the events in question. Indeed, the only significant fact that Frank and Ates were consistent about was that all three officers arrived in front of the small picnic table beneath the jungle gym (where Irving and Mann were sitting together) at the same time. Tr. 8, 9, 37, 38, 40, 41, 132, 133, 137.[3]

The government's rebuttal witness, Sergeant Pichardo, failed to resolve the tension between the accounts of Frank and Ates. Indeed, for the most part, she recounted yet a third version of events. Whereas Frank testified that Mann was seated on the opposite side of the

---

[3] Even if Frank had an opportunity to briefly observe Irving before Ates arrived, that would not square their testimony. Frank testified that Irving was manipulating marijuana with one hand and catching the results with his other hand when Frank first saw him, and that Irving continued doing so until Frank ordered him to stand up, at which point Irving dropped a small bag of marijuana on the ground. Both Ates and Franks testified that Ates was within a few feet of Frank when they identified themselves as police and ordered Irving and Mann to stand up and come out of the structure. Tr. 40, 126. According to both officers, they had essentially the same view of Irving at the time Frank claims he saw Irving drop the bag of marijuana and Ates says he saw no such thing.

Moreover, nothing in the chronology of events can explain the anomalous testimony about the alleged recovery of six small bags of marijuana from Irving. Frank said someone else seized them, and both of the other officers present said they did not seize them. When asked what it would like me to infer regarding who seized those drugs from the defendant, the government essentially shrugged. Tr. 209.

These are not trifling details. The police owe it to the communities they serve to do better than this.

7

table from Irving, Pichardo had them side by side on the same bench. Tr. 14; 181-84. Whereas Frank described Irving as preparing to make the marijuana cigar alone, Pichardo testified that Irving was emptying marijuana from a small plastic bag onto a cigar wrapper that Mann was holding in her open palms. Tr. 182-83. Pichardo did testify to seeing Irving drop a bag of marijuana, Tr. 173, but she shed no light on the mystery of who, if anyone, seized six additional small bags of marijuana from Irving, as she searched only Mann and did not see either Franks or Ates recover any marijuana from Irving's person. Tr. 172, 185. Though Pichardo was the commanding officer, she said that because a firearm was recovered, she would not even bother questioning her subordinates to find out who recovered the six bags, which she saw for the first time back at the stationhouse. Tr. 185-87. As for the cigar wrapper that Frank decided was not contraband and Ates decided was irrelevant to the case, Pichardo said the wind blew it away. Tr. 183.

In sum, on the most important question — what they saw before Irving was placed in custody — each officer testified to significantly different facts. Ates was unequivocal in his testimony that he never saw Irving with marijuana and that he handcuffed him based solely on Frank's instruction. Tr. 138. And although Frank and Pichardo both said that they saw Irving drop a small bag of marijuana, they did not agree on what Irving was doing, where he and Mann were sitting, or what Mann was doing. And though Frank said someone else seized six bags of marijuana from Irving's person, neither of the other officers backed that up.

There is a final detail that is small but disturbing. In a case where the basis of the challenged arrest is that two of three officers claim that Irving and Mann were preparing "weed to smoke," Tr. 182, everyone agrees that multiple searches of Irving and Mann and a search of the scene produced nothing that could have been used to light a marijuana cigar.

Considered together, the officers' testimony does not persuade me that there was probable cause for Irving's arrest. The government's burden is to establish that it is more likely true than not true that Irving was observed with marijuana before he was arrested. It has failed to meet that burden. It is not enough that two out of the three witnesses testified that they saw Irving holding marijuana before he was arrested. The outcome depends on the quality and the persuasiveness of the government's evidence, not on whether the government can get a majority of the testifying officers to agree on a general basis for arrest. I have examined the evidence before me in search of a coherent, even if less than completely consistent, justification for the warrantless arrest of Irving. But there are too many inconsistencies and anomalies in the record to support a finding of probable cause by the preponderance of the evidence.

I reject the government's assertion that suppressing the evidence at issue here necessarily implies a finding by me that one or more officers committed perjury. *See* Tr. 151. The question is whether the evidence as a whole satisfies the government's burden of persuasion. In this case, as in many others, a decision that particular testimony cannot be credited to the extent necessary to find that the government's burden of persuasion has been met does not depend on or signal a finding of perjury. *Cf. United States v. Richter*, 826 F.3d 206, 209 (2d Cir. 1987) ("[P]rosecutors have been admonished time and again to avoid statements to the effect that, if the defendant is innocent, government agents must be lying."). An order granting the motion before me does not imply perjury by Frank and Pichardo any more than an order denying it would imply perjury by Ates. Because the determination is not necessary to a resolution of the motion, I neither find perjury nor rule it out.

2.  *The Charge of Being in a Park at Night*

As the evidence unfolded at the suppression hearing, the government's position evolved. Its written opposition to the defendant's motion to suppress presented a single theory: there was probable cause to arrest Irving for possession of marijuana. According to the government, that probable cause justified the arrest, the search incident to the arrest in which the firearm was seized and, together with a *Miranda* waiver, the custodial interrogation in the stationhouse the following morning. *See* Tr. 217 (summarizing motion papers).

After hearing Ates's testimony, the government orally proffered a second theory: Irving might properly have been arrested for being in "a park [at] 10:00 at night without a kid." Tr. 153. The theory was not briefed and it was undeveloped, both factually and legally, at the hearing. Specifically, there was no evidence about what time, if any, Nautilus Park closed for the night, or whether being present in the park past that time was a transgression for which Irving could properly have been arrested. Tr. 153. At the conclusion of the hearing, I permitted the government additional time to supplement its written submissions to advance this alternative legal theory. In fairness to the defendant, since both sides had unconditionally rested, I explicitly stated that I would not permit a post-hearing enlargement of the factual record. Tr. 217.

After the hearing, I invited the government's attention to two of the New York Parks Rules and Regulations, 56 R.C.N.Y. §§ 1-03 and 1-07. The first specifies that persons may enter and use the parks until 1:00 a.m. "unless other open hours are posted" in the park; the second makes a violation of that provision a misdemeanor. I asked the government to address the relevance of these provisions in its post-hearing submission.

On the following day, the government filed a letter arguing that Irving was lawfully arrested for a violation of 56 R.C.N.Y. §§ 1-03. Notwithstanding my prohibition on the

10

enlargement of the factual record, the government's letter attached more evidence – a photograph of a sign at the park that specified a closing time of 9:00 p.m. Though there had been testimony about that sign at the hearing (it was visible in the distance in one of the photographs of the park, but the writing on it was not readable), the record of the hearing contained no evidence of when Nautilus Playground closed for the night.

I reject the government's argument on procedural grounds and on the merits. Especially in light of my explicit admonition that the post-hearing submission could address only legal issues, the government should have sought permission to reopen the record before submitting additional evidence. I deny its implicit application for such relief. As for the merits, I would find that even if the sign at issue was there on July 9, 2009, its stipulated closing time pertained only to the basketball court, at the entrance to which the sign was posted, and not to the area of the park in which the defendant was arrested. *See* Tr. 89, 166.

Because the government has failed to carry its burden of demonstrating that Irving was in violation of any "park after dark" regulation, I reject that claimed justification for his warrantless arrest.

CONCUSION

The motion to suppress is granted.[4] A status conference will be held on December 4, 2009 at 9:30a.m.

So ordered.

John Gleeson, U.S.D.J.

Dated: November 25, 2009
Brooklyn, New York

---

[4] Although post-arrest statements made by a defendant are not necessarily suppressed if the arrest is unsupported by probable cause, it is the government's burden to show that the taint of the unlawful arrest sufficiently dissipated before the statements were made. *See Wong Sun v. United States*, 371 U.S. 471, 485-86, 491 (1963); *United States v. Oguns*, 921 F.2d 442, 447 (2d Cir. 1990). Because the government has not argued that Irving's post-arrest statements were sufficiently attenuated from the arrest to be admissible even if his arrest was unsupported by probable cause, I suppress the statements as well as the physical evidence. I need not address the other proffered grounds for suppression.